United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BALAM EUGENIO GONZALEZ,<br>Petitioner,<br>v.<br>RAUL MORALES, et al.,<br>Respondents. | Case No. 24-cv-00163-JSC<br><br>**ORDER RE: HABEAS PETITION**<br><br>Re: Dkt. No. 1 |

Petitioner seeks federal habeas corpus relief from his state conviction under 28 U.S.C. § 2254. (Dkt. No. 1.)[1] After carefully considering the parties' briefs and the relevant legal authority, the Court concludes oral argument is unnecessary, *see* N.D. Cal. Civ. L.R. 7-1(b), and DENIES Petitioner's petition for a writ of habeas corpus. The state court's adjudication of Petitioner's claims did not result in a decision which "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or which "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d).

## BACKGROUND

### I. PROCEDURAL HISTORY

Following a jury trial in the Santa Clara County Superior Court, Petitioner was convicted of first-degree murder of Pedro Cortez and Armando Heredia, and attempted premeditated murder of Brian Joya. (Dkt. No. 14-5 at 273, 279, 284.) The jury also found certain special circumstances, including multiple murder, firearm, and gang enhancements. (*Id.* at 273-275, 279-

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

281, 284-285.) On October 12, 2018, the court imposed a sentence of life without possibility of parole, consecutive to both life with the possibility of parole and 80 years. (Dkt. No. 14-6 at 177-178.)

Petitioner appealed, and on April 27, 2022, the California Court of Appeal ordered the Superior Court to amend the abstract of judgment to "vacate the balances on the costs of [Petitioner's] appointed counsel and the criminal justice administration fee," but otherwise affirmed the Superior Court's judgment. (Dkt. No. 14-31 at 4.) Petitioner then petitioned for the California Supreme Court's review. (Dkt. No. 14-32.) After granting review and delaying action pending disposition of a related issue in another case, the California Supreme Court dismissed review of Petitioner's case on October 12, 2022. (Dkt. Nos. 14-33, 14-34.)

On January 9, 2024, Petitioner filed this writ of habeas corpus. (Dkt. No. 1.) Petitioner contends the trial court erred because:

> (1) Not declaring a mistrial after Lomeli testified that Petitioner committed an additional uncharged shooting denied Petitioner a fair trial in violation of his Fourteenth Amendment right to due process;
>
> (2) Since Lomeli wasn't qualified to testify [as] an expert, allowing him to do so enabled the prosecutor to use him as a conduit for raw hearsay in violation of Petitioner's Sixth Amendment confrontation rights;
>
> (3) By presenting Lomeli as both a fact and expert witness, the prosecutor improperly vouched for Lomeli's credibility, both by giving him an undeserved status of "expert witness" and by having a police gang expert bolster Lomeli through her own testimony agreeing with him. This denied Petitioner a fair trial in violation of his Fourteenth Amendment right to due process;
>
> (4) Because there was sufficient evidence that Lomeli was an accomplice, the trial court's failure to instruct the jury sua sponte that an accomplice's testimony should be viewed with caution deprived Petitioner of Fourteenth Amendment due process by worsening the due process problems already involved in Lomeli's testimony;
>
> (5) Yajaira Gonzalez'[s] statements to the police were coerced and involuntary, and their admission violated Petitioner's Fourteenth Amendment right to due process; [and]
>
> (6) The cumulative effect of the trial errors was prejudicial and denied Petitioner a fair trial in violation of in violation of his Fourteenth Amendment right to due process.

United States District Court
Northern District of California

(Dkt. No. 1 ¶¶ 128-133 (cleaned up).) The Court ordered Respondents show cause why the writ should not be granted. (Dkt. No. 6.) After several extensions of the briefing schedule, the motion is now fully briefed. (Dkt. Nos. 12, 13, 18, 21, 23, 25, 27, 28.)

## II. FACTUAL BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

> **I. Attempted Murder of Joya**
>
> In August 2012, Joya was walking with a group of friends on San Jose Avenue when he heard a noise that sounded like a firecracker and felt a sting on his leg. The sting was a bullet penetrating his right thigh. Unable to walk on his own, Joya's friends assisted him to a nearby house. The shooting occurred within the territory of West Side Mob, a subset of the Norteño gang.
>
> One of the police officers who responded to the scene found two .45 caliber spent shell casings in the street. On the sidewalk, he found a fired bullet and a bullet's copper jacketing.
>
> Video from a nearby surveillance camera showed a white Mitsubishi Eclipse with a unique black bra on the hood at the intersection of San Jose Avenue and Little Orchard Street when the shooting occurred. The video revealed the car made a U-turn on Little Orchard Street before driving back toward Joya and his group on San Jose Avenue.
>
> **II. Murder of Heredia**
>
> About five days later, Heredia and Erik Velasquez were near the intersection of King Road and Burdette Drive in San Jose. Heredia was on a scooter, and Velasquez was on a skateboard. As they were traveling down Burdette Drive, Velasquez heard a bang. He looked back and saw Heredia on the ground. Velasquez helped Heredia to the front of a nearby store, where Heredia collapsed. Velasquez called 911 before running away.
>
> K. Le was standing outside a nearby sports bar when he heard loud bangs that sounded like gunshots. He saw a white Eclipse accelerating down the street, but he did not see a black bra on the car's hood. Although the car's driver's side window was up, Le saw the driver was wearing a red and white hat, but he was unable to identify the driver.
>
> The police department's homicide crime scene unit responded and found three shell casings and a bullet's copper jacketing near where Heredia was shot. They also recovered one fired bullet that night and a second the next day.
>
> Heredia died from multiple gunshot wounds. The intersection where he was shot was in the territory of Varrio Meadowfair, a subset of the Norteño gang.

United States District Court
Northern District of California

**III. Two Shootings Connected**

Police investigation connected the two shootings. The same gun was used in both shootings, and a white Eclipse was present at both.

Gonzalez drove a white Eclipse matching the description of the car seen at both shootings. The police seized his car five days after Heredia was killed. The car did not have any bullet holes or broken windows.

**IV. Gonzalez's Police Interview**

About a month after the car was seized by police, Gonzalez was arrested on an unrelated charge. While he was in custody, Detective Sergeant John Barg of the San Jose Police Department interviewed him regarding the Joya shooting. Gonzalez said his sister owned the Eclipse with a bra on the hood, but Gonzalez admitted he drove it.

Gonzalez initially denied being around San Jose Avenue when Joya was shot. After Gonzalez's repeated denials, Barg and his partner used a ruse and told Gonzalez they believed he was in the area and he may have been the victim of a crime; they urged him to tell them what happened because they were after someone else. Eventually Gonzalez admitted he was there when the shooting occurred, but he claimed West Side Mob gang members were shooting at him. Gonzalez said he was driving down San Jose Avenue when he saw a group of about six men. One of them shouted West Side Mob and fired multiple shots at him, shooting out two of the Eclipse's windows. After being shot at but uninjured, Gonzalez made a U-turn and drove back toward the shooter with the intent of running over him. Gonzalez denied shooting at the group and suggested Joya must have been accidently hit by friendly fire from a West Side Mob gang member.

Gonzalez's version of the incident was not supported by the physical evidence. The video recording from the intersection where the shooting took place did not show his car windows were shattered. Nor did the police find shattered glass in the street. Although Gonzalez claimed the shooter emptied the gun's magazine shooting at him, only two shell casings were found, and they were found in the street, not where Gonzalez said the shooter was standing.

**V. Firearm Found and Linked to Multiple Cases**

The day after Barg interviewed Gonzalez, the police conducted a parole search of a residence occupied by two Sureño gang members and found a .45 caliber handgun concealed in a dog food bag in the kitchen. A firearms examiner determined the handgun fired the shell casings collected at the scene of Heredia's homicide and the Joya shooting. The firearm was also linked to several other shootings that occurred while Gonzalez was in custody on unrelated charges.

**VI. Murder of Cortez**

In November 2013, Cortez, whose nickname was "Moko," was hanging out in Capitol Park with Catarino Licea and Marcos Cuevas. The park was within the territory of Capital Park Locos, a Norteño gang subset. As the three were walking through the park, they heard gunshots. Cortez exclaimed he had been hit. He took a couple of steps and collapsed. He died from a gunshot wound to the chest.

Licea did not see shooter. Cuevas told the police the shots were fired from a shiny, black Charger, Camaro, or similar looking "muscle" car. He saw the car's rear but did not see its occupants.

M. Galvan was driving behind a black Challenger with tinted windows near Capitol Park. The Challenger slowed down, and Galvan heard what sounded like two gunshots. She saw a man in the park collapse. Galvan did not see the car's occupants or a gun pointing out of the car's window.

Later that evening, 13-year-old Z.D. went to a party at the apartment of her friend Pablo, who lived in the same building as Gonzalez and his family. Pablo was a Sureño gang member. Z.D. was with Pablo near the front of the building when a black car with tinted windows pulled up in the driveway. Gonzalez got out of the car and talked to Pablo for a few minutes before going upstairs to his apartment. Gonzalez appeared nervous, was sweating, and walking fast. When Pablo and Z.D. went inside, Pablo told her "his cousin or friend" had just killed a "Buster," which is a derogatory term for a Norteño gang member. Pablo showed her a picture of the victim on the news and said it was Moko. He told her more than one person was involved in the shooting. When questioned by the police, Z.D. said there were two people in the car—the driver and a shooter.

Gonzalez was arrested several days later, driving Sister's white Nissan Altima. Police seized the Challenger pursuant to a search warrant.

**VII. Sister's Police Interview**

About 10 days after Cortez was fatally shot, the San Jose police contacted Sister about releasing her Altima to her. Sister's parents took her to the police station to retrieve the car. At the station, Detective Sergeant Patrick Guire and Detective Ken Tran interviewed her about Gonzalez's involvement in Cortez's murder.

Initially, Sister tried to create an alibi for her brother. She told the detectives the day Cortez was shot, she used the Challenger to run errands with her mother and Gonzalez stayed at home. When pressed by the detectives, she admitted that was not true and she said that to protect her brother. Eventually, she told them Gonzalez was driving the Challenger the afternoon Cortez was shot. She said Gonzalez told her three guys tried to shoot him, so he took out a gun and started shooting. Gonzalez told her he was going to spend the night at someone else's house, because "[T]hey're going to come and look for me." He left the Challenger and took her Altima. He told her to

United States District Court
Northern District of California

"clean" the Challenger and to be careful because there were problems between the Sureños and Norteños.[2]

**VIII. Forensics**

In December 2013, a crime scene investigator collected gunshot residue from the Challenger's interior. No residue was detected in the driver's area, but gunshot residue was detected in the front passenger area. Analysis also detected the presence of the element cobalt. The presence of cobalt in the gunshot residue was uncommon; an analyst with the crime laboratory was unaware of any cases where cobalt had been detected in gunshot residue. Cobalt was also found on the two spent projectiles recovered during Cortez's autopsy, further linking the Challenger to his murder.

**IX. Lomeli's Testimony**

Over defense objection, the trial court permitted Lomeli to testify as an expert on the Sureño gang and as a percipient witness concerning Gonzalez's actions and statements after the Heredia and Cortez shootings. At the time of trial, Lomeli was serving a felony sentence on a charge of assault with a deadly weapon and testified under a grant of immunity.

**A. Lomeli's Gang Testimony**

Lomeli was a Sureño gang member from the ages of 14 to 21. He explained the Sureño gang had multiple "hoods" or subsets. He joined the subset Varrio Lokotes Trece (VLT) when he was living in the area of Poco Way. Sureños refer to the subset as both Poco Way and VLT. VLT had about 30 members.

Lomeli testified about the history of the Sureño gang and explained its members associate with the color blue and the number 13. As a Sureño, he was educated about Norteños, their rivals, who associate with the color red and the number 14. Sureños have several derogatory names for Norteños, including "buster." One of VLT's nearest rivals is Capitol Park Locos, and VLT had altercations with them while Lomeli was a member. West Side Mob and Varrio Meadowfair were two other Norteño subsets in San Jose.

Lomeli also discussed the structure of the Sureño gang and its expectations of the neighborhood subsets, including the payment of monthly dues. VLT had regular meetings attended by 15 or so members to discuss general operations in their territory, Norteño incursions, and dues. Every couple of months, VLT would meet with other Sureño neighborhood gangs.

As a Sureño, Lomeli stole over a hundred cars, committed assaults, and perpetrated robberies. Sometimes he stole cars with other Sureño gang members, either members of VLT or other subsets, and they would divide up the profit. He had committed about 20

[2] "At trial, Sister testified she did not remember anything she said during her police interview. Because Gonzalez challenges the admission of Sister's police interview, we discuss it in more detail post." (Dkt. No. 14-31 at 8 n.3.)

United States District Court
Northern District of California

robberies. He had stabbed seven or eight people, believing some of them were rival Norteños.

Lomeli explained how a Sureño earned respect in the gang and why it was important. Members were expected to engage in acts of violence, and members who killed rival gang members earned more respect. A Sureño would be disciplined if he assaulted or killed a nongang member because such behavior was frowned upon. Lomeli had talked to Sureños who said they killed someone, but he had never been present when a Sureño killed another person. He knew 10 or 15 Sureños who had been killed. When a Norteño kills a Sureño, the Sureño gang members want revenge.

Lomeli described the prevalence of firearms in the gang. He, like many members, had a personal gun and access to gang or "hood" guns that were passed around amongst members. If a Sureño did not have a gun, he could get one from another member. As a VLT member, Lomeli saw more than 10 guns. He borrowed a gun from a fellow gang member to commit crimes for the gang and witnessed other members borrow guns to commit crimes.

Lomeli knew Gonzalez was a VLT or Poco Way Sureño in 2012. Lomeli was present at VLT meetings with Gonzalez and used to hang out with Gonzalez and other members. Gonzalez's nickname was "Shy Boy." The "P" tattoo on Gonzalez's arm stood for Poco Way, and the three dot tattoo on his elbow signified Sureño gang membership.

Lomeli dropped out of the gang in March 2013, when he was in custody. He remained in protective custody for about a month before he was released. His fellow Sureño members did not know he had dropped out.

**B. Lomeli's Percipient Witness Testimony**

After questioning Lomeli about being a Sureño, the prosecutor questioned him about events occurring in 2012 and 2013. The prosecutor asked Lomeli about the shooting of Heredia, and Lomeli said Heredia was a Norteño in the Meadowfair gang. Lomeli and some other Sureños were standing in front of a neighborhood store when Gonzalez drove up in his Eclipse. Gonzalez told them he shot somebody and asked for their help in looking for expended shells in his car. Lomeli testified he found two shells; however, in a prior statement to the police, he said he did not find any. Gonzalez was armed with "a Narco gun" that had a chrome handle and a design or engravings on the barrel. It was different than the one linked to the Heredia and Joya shootings. There was a passenger in Gonzalez's car, but at trial, Lomeli could not remember who it was. Lomeli previously told the police the passenger was a gang member whose moniker was "Psycho," and he was also armed with a handgun. When Lomeli was in custody with Gonzalez, Gonzalez told him the day Lomeli helped him look for expended shells in the Eclipse was the day he shot Heredia and Heredia was riding a scooter when he shot him. Lomeli had seen Gonzalez in possession of three different guns on five different occasions.

> Lomeli did not personally know Cortez but had heard of him and knew he was a Norteño. When Cortez was shot, Lomeli had already dropped out of the gang, but Gonzalez and others did not know he had left the gang. The day after Cortez was killed, Gonzalez visited Lomeli at his house and had dinner with Lomeli's family. When they were outside, Gonzalez told Lomeli he had been driving his car when he saw Cortez and another Norteño. Gonzalez believed they were going to shoot him, so he shot them first. Gonzalez told Lomeli someone was in the car with him when the shooting occurred, but Gonzalez did not want to name the person. Gonzalez was driving Sister's Altima the day he visited Lomeli and explained he was doing so because his car was "hot."
>
> **X. Gang Expert Testimony**
>
> Detective Elizabeth Ramirez testified as an expert on criminal street gangs. She testified a Sureño is a criminal street gang member in San Jose and the Sureño gang identifies with the color blue and the numbers 1, 3, and 13. Norteños, their rivals, identify with the color red and the number 14. The primary activities of the Sureño gang in San Jose are assaults, robberies, and stealing cars. Ramirez explained it is crucial for gangs to instill fear in others to deter rivals from attacking and prevent people from reporting their crimes and cooperating with the police. If a Sureño kills a Norteño, it benefits the Sureño gang as a whole and the shooter's Sureño subset because it shows the gang is "a force to be reckoned with" and instills fear. Killing a Norteño also enhances the shooter's standing amongst the gang's other members. Ramirez testified a gang member might dress in rival gang colors to facilitate an attack as it allows him to get closer to his target undetected and confuses law enforcement investigating the crime.
>
> VLT, also known as Poco Way, is a Sureño subset in the Poco Way neighborhood. Ramirez testified Gonzalez's tattoos indicated he was associated with Poco Way Sureños. Based on her training and experience and Lomeli's testimony, Ramirez opined Gonzalez was a member of the VLT/Poco Way criminal street gang. Ramirez also opined Cortez was a member of the Norteño gang subset Capitol Park Locos and Joya was associated with the Norteño subset West Side Mob. Heredia was killed in the territory of the Norteño subset Varrio Meadowfair. Although Ramirez did not believe Heredia was a gang member, Velasquez, his companion, was and was wearing Norteño colors at the time of the shooting. When given hypotheticals based on the facts of each shooting in this case, Ramirez opined the shootings benefited the Sureño gang.

(Dkt. No. 14-31 at 4-12.) *See also People v. Gonzalez*, No. G060374, 2022 WL 1236808, at *2-6 (Cal. Ct. App. Apr. 27, 2022).

## DISCUSSION

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in

custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

AEDPA further provides such an application "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim":

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In making this determination, a district court "review[s] the state court's last reasoned decision." *Maxwell v. Roe*, 628 F.3d 486, 495 (9th Cir. 2010) (citations omitted). To the extent a higher state court does not provide further reasoning, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018); *see also id.* at 125-26 (explaining the state may rebut that presumption).

Section 2254(d) imposes a "highly deferential standard for evaluating state-court rulings . . . which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (cleaned up). With respect to section 2254(d)(1), the "contrary to" clause allows "a federal habeas court [to] grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Furthermore, the only definitive source of "clearly established Federal law, as determined by the Supreme Court," is "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412; *see also Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003) ("While circuit law may be persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, . . . only the Supreme Court's holdings are

binding on the state courts and only those holdings need be reasonably applied." (cleaned up)), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

And with respect to section 2254(d)(2), the "unreasonable determination" clause allows "a federal habeas court [to] grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Courts determine whether the state court unreasonably applied clearly-established law by asking if the state court's application was "objectively unreasonable." *Id.* at 409; *see also Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) ("It is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." (quotation marks and citation omitted)).

Petitioner seeks federal habeas relief based on six federal constitutional claims. Because the California Supreme Court granted review of Petitioner's claims but then dismissed them in an unexplained decision, this Court looks through to the California Court of Appeal decision.

## I. FAILURE TO DECLARE A MISTRIAL AFTER MR. LOMELI TESTIFIED PETITIONER WAS INVOLVED IN AN UNCHARGED SHOOTING

In interviews before trial, Mr. Lomeli told officers he did not "know anything about" the San Jose Avenue shooting of Mr. Joya. (Dkt. No. 14-20 at 31.) However, at trial, the prosecutor asked Mr. Lomeli, "[a]side from Capitol Park and aside from Mando, how many other shootings are you aware of that [Petitioner] has committed?" (*Id.* at 28-29.) When Mr. Lomeli responded he knew "about one more," the prosecutor asked about that other one, and Mr. Lomeli responded "[i]t was right there on Bonita and 33rd." (*Id.* at 29.) Defense counsel objected and, at side bar, asked the court to "declare a mistrial"; the prosecutor also objected to striking the testimony. (*Id.* at 29, 31.) The court struck the question and answer and admonished the jury to disregard it, but refused to declare a mistrial because it "assume[d] that the jurors [would] follow the court's instructions and admonishments." (*Id.* at 33, 40.)

Petitioner now argues the trial court's failure to declare a mistrial after the prosecutor improperly elicited Mr. Lomeli's testimony regarding an uncharged shooting denied Petitioner his

Fourteenth Amendment Due Process right to a fair trial.

**A. State Court Opinion**

When Petitioner raised this issue on direct appeal, the California Court of Appeal rejected his claim and held:

> We discern no abuse of discretion in the trial court's decision to deny Gonzalez's motion for a mistrial. Based on the evidence before the jury, the court could reasonably conclude the brief reference to another shooting did not irreparably damage Gonzalez's chance of receiving a fair trial and any damage could be cured by striking the testimony and admonishing the jury. (See *People v. Price* (1991) 1 Cal.4th 324, 428 [concluding denial of mistrial motion not abuse of discretion where witness's reference to polygraph was brief and court admonished jury to disregard testimony].)
>
> "'Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured. [Citations.]' [Citation.]" (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1428-1429 (*McNally*).) That is exactly what occurred here. The court told the jury the prosecutor's question and Lomeli's answer concerning a shooting at 33rd Avenue had been stricken, and the court admonished the jury not to consider it "for any purpose." "'We presume that jurors understand and follow the court's instructions[.]' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005 (*Hovarter*).) "'It is only in the exceptional case that "the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions." [Citation.]' [Citation.]" (*McNally, supra*, 236 Cal.App.4th at p. 1429.) This is not such a case. The court's admonishment was sufficient to cure any prejudice to Gonzalez.
>
> Gonzalez contends "[n]o reasonable jury could have followed the court's instruction to disregard evidence of a third murder." Gonzalez misreads the record. The prosecutor asked Lomeli if he knew "how many other shootings" Gonzalez had committed. The prosecutor did not ask Lomeli about a third murder, and Lomeli did not testify to such. Gonzalez is not entitled to relief on this claim.

(Dkt. No. 14-31 at 15-16.)

**B. Analysis of Federal Claim**

A prosecutor's improper questioning may violate due process if it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). So, "[w]hen a defendant contends that a prosecutor's question rendered his trial fundamentally

unfair, it is important as an initial matter to place the remark in context." *Greer v. Miller*, 483 U.S. 756, 765-66 (1987) (cleaned up). And a court's curative instruction to disregard evidence may "clearly indicate that the prosecutor's improper question did not violate [the defendant's] due process rights" because the Supreme Court "normally presume[s] that a jury will follow an instruction to disregard inadmissible evidence inadvertedly presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Id.* at 766 & n.8 (quotation marks and citations omitted); *see also Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir. 1997) (holding there are only "some extreme situations in which curative instructions will not neutralize the prejudice when evidence is improperly admitted" (citations omitted)).

Petitioner contends the court's decision to issue a curative instruction rather than declare a mistrial violated his Fourteenth Amendment Due Process rights because "[n]o jury could have followed the court's instruction to disregard evidence of another possible murder." (Dkt. No. 1 at 33.) But Petitioner points to no evidence indicating the jury could not or did not follow the court's instruction to disregard the evidence, and so fails to show any error in not declaring a mistrial resulted in actual prejudice. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) ("[H]abeas petitioners . . . are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"). Petitioner also does not cite any case supporting the proposition the testimony at issue falls within one of the "extreme situations in which curative instructions will not neutralize the prejudice." *See Aguilar*, 125 F.3d at 820; *see also Richardson v. Marsh*, 481 U.S. 200, 207-208 (1987) (refusing to expand the "narrow exception" to the rule a curative instruction is sufficient to a codefendant's confession which "was not incriminating on its face" (citing *Bruton v. United States*, 391 U.S. 123, 135-36 (1968)); *cf. Stewart v. United States*, 366 U.S. 1, 4 (1961) (vacating a conviction when the prosecutor asked the defendant about his refusal to testify in prior trials although the defendant had not requested a cautionary instruction). So, the state court's determination "[b]ased on the evidence before the jury, the court could reasonably conclude the brief reference to another shooting did not irreparably damage [Petitioner's] chance of receiving a fair trial and any damage could be cured by striking the testimony and admonishing

United States District Court
Northern District of California

the jury" was not contrary to, and did not involve an unreasonable application of, clearly established Supreme Court precedent. (Dkt. No. 14-31 at 15.)

Petitioner also argues his Due Process rights were violated because the prosecutor's misconduct was intentional. However, Petitioner reliance on Ninth Circuit law does not show the state court's decision was contrary to clearly established Supreme Court precedent. (Dkt. No. 1 at 32-33.) *See Kernan v. Cuero*, 583 U.S. 1, 8 (2017) ("[C]ircuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court." (cleaned up)). And the Supreme Court has made clear "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982); *see also Darden*, 477 U.S. at 181 ("Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." (citations omitted)). So, whether the prosecutor's misconduct was intentional does not affect the viability of Petitioner's claim.

So, the state court's rejection of Petitioner's claim the denial of his motion for a mistrial violated his Due Process right to a fair trial was not contrary to, or involve an unreasonable application of, clearly established Supreme Court precedent.

## II. ALLOWING MR. LOMELI TO TESTIFY AS AN EXPERT WITHOUT QUALIFICATIONS ALLOWED HEARSAY

According to Petitioner, Mr. Lomeli was not qualified as an expert witness because "he had no specialized education or training," "was only a low level member of the Poco Way subgroup," had not qualified as a Sureño gang expert at any other trial," "had never been present when a Sureño killed a Norteño," and no experience beyond "attending meetings and committing auto thefts and robberies." (Dkt. No. 1 at 34 (citing Dkt. No. 14-19 at 43-45, 53).) So, Petitioner argues, "[b]y allowing Lomeli, a nonexpert, to testify as if he were an expert, the court allowed Lomeli to act as a conduit for raw hearsay, in violation of petitioner's Sixth Amendment confrontation rights." (*Id.*)

### A. State Court Opinion

The California Court of Appeal first held Petitioner had forfeited this claim by failing to

object at the trial court:

> Gonzalez contends the trial court abused its discretion by designating Lomeli as a gang expert. The Attorney General argues Gonzalez forfeited his appellate challenge by failing to object below, and even if the claim was preserved, it fails on its merits because the court properly determined Lomeli was qualified to testify as an expert on the Sureño gang based on his experience with it. We agree with the Attorney General.
>
> **1. Forfeiture**
>
> As the Attorney General points out, Gonzalez did not object in the trial court to Lomeli's designation as an expert witness on the Sureño gang. The "failure to specifically object to an expert's qualifications forfeits the [issue on appeal]." (*People v. Morales* (2020) 10 Cal.5th 76, 98 (*Morales*).) In his reply brief, Gonzalez asserts his claim Lomeli was not qualified to testify as an expert witness was preserved because his counsel objected in the motion in limine to Lomeli being permitted to testify as both a lay and expert witness. We disagree. It is well established an evidentiary objection on one ground does not preserve an appellate claim on a different ground. (*People v. Marks* (2003) 31 Cal.4th 197, 228.) The arguments Gonzalez made in his in limine motion do not preserve his appellate claim because he did not seek exclusion of Lomeli's testimony on the ground Lomeli was unqualified to testify as an expert on the Sureño gang. (See *Morales, supra*, 10 Cal.5th at p. 98 [although defendant objected to witness's testimony on other grounds, failure to object on basis of witness's qualifications forfeited issue].) Thus, Gonzalez forfeited his appellate challenge. (See *People v. Townsel* (2016) 63 Cal.4th 25, 46 [concluding defendant's failure to object to witness's expertise forfeited claim court abused its discretion permitting witness to testify as expert].)[3] Nevertheless, even assuming Gonzalez preserved his claim for review, it is without merit.

(Dkt. No. 14-31 at 17-18.) The court then "conclude[d] the trial court did not abuse its discretion

---

3

> Addressing the Attorney General's forfeiture argument, Gonzalez contends in his reply brief "it is clear that trial counsel argued that Lomeli was completely unqualified to testify as a gang expert." But Gonzalez fails to provide us with any citation to the record supporting this contention, and we have not found such clarity in our review of the record. "'It is the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations.' [Citations.] If a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived. [Citation.]" (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.)
>
> In our review of the record, we found the defense objection to Lomeli's qualifications as an expert on the Norteño gang. We did not find an objection Lomeli was completely unqualified to testify as an expert on the Sureño gang.

(Dkt. No. 14-31 at 18 n.4.)



United States District Court
Northern District of California

by permitting Lomeli to testify as an expert on the Sureño gang based on his seven years of personal experience as a Sureño in VLT." (*Id.* at 20.) The court nevertheless addressed and rejected Petitioner's argument the trial court had allowed hearsay violating his confrontation clause rights:

> Next, Gonzalez contends by permitting Lomeli to testify as an expert, the trial court allowed him "to act as a conduit for raw hearsay" in violation of Gonzalez's constitutional right to confrontation. Gonzalez makes this broad contention but does not provide any factual support for it. As the Attorney General points out, Gonzalez "does not identify any particular hearsay statements that were purportedly improperly funneled to the jury through Lomeli's testimony. Nor does [Gonzalez] point to any specific statements or opinions by Lomeli that purportedly violated his confrontation rights." Even after this deficiency was pointed out by the Attorney General, Gonzalez did nothing to remedy it in his briefing.
>
> "'The appellate court is not required to search the record on its own seeking error.' [Citation.] Thus, '[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived. [Citation.]' [Citations.]" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Gonzalez has not pointed us to any portion of Lomeli's testimony that was an improper conduit for hearsay. Thus, he has forfeited his claim as we will not search the transcript for support when he has failed to do so.

(*Id.* at 20-21.)

**B. State Procedural Bar**

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citations omitted). Specifically:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750. "Once the state pleads the affirmative defense of an independent and adequate state procedural bar, the burden to place that defense in issue shifts to the petitioner . . . at a minimum, by specific allegations by the petitioner as to the adequacy of the state procedure." *Bennett v.*

*Mueller*, 322 F.3d 573, 584 (9th Cir. 2003).

The state court held Petitioner forfeited his Confrontation Clause claim because he "did not object in the trial court to Lomeli's designation as an expert witness on the Sureño gang." (Dkt. No. 14-31 at 17.) Specifically, although Petitioner argued he "objected in the motion in limine to Lomeli being permitted to testify as both a lay and expert witness, . . . [i]t is well established an evidentiary objection on one ground does not preserve an appellate claim on a different ground." (*Id.* at 17-18 (citing *People v. Marks*, 31 Cal. 4th 197, 228 (2003)).) *See also Marks*, 31 Cal. 4th at 228 (holding an evidentiary objection "based on a different ground from that advanced at trial[] does not preserve the claim for appeal"). Here, Petitioner does not contest California's contemporaneous objection rule is an independent and adequate state procedural rule. *See Fairbank v. Ayers*, 650 F.3d 1243, 1247 (9th Cir. 2011) (holding because "California consistently applies its contemporaneous objection rule when a party fails to object to the admission of evidence[,] . . . the California Supreme Court applied an independent and adequate state procedural rule" (citations omitted)); *see also Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005) (holding state procedural grounds precluded review of federal claim after the California court held the petitioner "failed to challenge the admission of the November 5 confession at trial and that his claims with respect to it were therefore procedurally barred under California law"); *Phongboupha v. Hedgpeth*, No. C 12-1025 RMW (PR), 2015 WL 546702, at *6 (N.D. Cal. Feb. 10, 2015) (holding a California court's reliance on *Marks* constituted independent and adequate state law grounds). So, the California Court of Appeal's holding Petitioner had forfeited his Confrontation Clause claim was based on an independent and adequate state procedural rule.

Therefore, before this Court can review Petitioner's federal claim, Petitioner must demonstrate "cause for the default" and "actual prejudice as a result of the alleged violation of federal law" or "demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see also Murray v. Carrier*, 477 U.S. 478, 488 (1986) (holding cause requires a showing "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule,"); *Gandarela v. Johnson*, 286 F.3d 1080, 1085 (9th Cir. 2002) (holding a fundamental miscarriage of justice requires showing "actual

innocence"). Petitioner does not argue there was cause for his default or that the court's failure to consider his claims will result in a fundamental miscarriage of justice. Instead, Petitioner only cites his pretrial motion in limine objecting to Mr. Lomeli's testimony as both a lay and expert witness, which did not object to Mr. Lomeli's qualifications as an expert witness and which the California Court of Appeal therefore deemed insufficient to preserve that objection. (Dkt. No. 14-4 at 243-255; *see also* Dkt. No. 14-31 at 17-18.)

So, the state court's independent and adequate state procedural grounds for rejecting Petitioner's claim prevents federal habeas review of Petitioner's Confrontation Clause claim.

## III. ALLOWING MR. LOMELI TO TESTIFY AS BOTH A LAY AND EXPERT WITNESS AND CALLING RAMIREZ AS AN EXPERT

Petitioner argues the prosecutor vouched for Mr. Lomeli's lay witness testimony by using him "as an expert witness when he was also the main informant against [P]etitioner." (Dkt. No. 1 at 36.) Petitioner also argues the prosecutor vouched for Mr. Lomeli's testimony by calling another expert, Ms. Ramirez, who "testified she agreed with [Mr.] Lomeli" and "relied on his testimony as a fellow gang expert to conclude that petitioner was a member of the VLT / Poco Way subset of the Sureño street gang." (*Id.* at 37 (citing Dkt. No. 14-20 at 56, 63, 68, 70-71).) Petitioner therefore argues the prosecutor improperly vouched for Mr. Lomeli in violation of Petitioner's Fourteenth Amendment Due Process right to a fair trial.

### A. State Court Opinion

In rejecting Petitioner's argument the prosecutor impermissibly vouched for Mr. Lomeli's opinion, the California Court of Appeal wrote:

> Gonzalez contends the prosecutor improperly vouched for Lomeli's credibility by presenting him as both a lay and expert witness. We disagree.
>
> A prosecutor does not vouch for a witness's credibility by simply calling him as a witness. "'Impermissible "vouching" may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony.' [Citation.]" (*People v. Rivera* (2019) 7 Cal.5th 306, 336.) The prosecutor did no such thing here. We discern no vouching by the prosecutor in treating Lomeli as both a percipient and expert witness.

> Moreover, the jury was instructed it alone was responsible for judging the credibility and believability of the witnesses (CALCRIM No. 226). CALCRIM No. 226 listed several factors for the jury to consider in evaluating a witness's credibility and deciding whether to believe all, part, or none of a witness's testimony. The fact the witness testified as both a lay and expert witness was not one of those factors. The jury was also instructed on how to evaluate the believability of an expert witness, including considering the expert's knowledge, skill, and experience (CALCRIM No. 332). The court's instructions, as a whole, would not permit the jury to believe Lomeli's testimony as a percipient witness just because he testified as an expert. We presume the jury understood and followed the court's instructions. (*Hovarter*, *supra*, 44 Cal.4th at p. 1005.) Thus, we are satisfied the jury was capable of properly evaluating Lomeli's testimony.

(Dkt. No. 14-31 at 21-22.)

**B. Exhaustion**

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court" by "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 845 (1999); *see also* 28 U.S.C. §§ 2254(b)(1)(A), (c). And to give state courts that opportunity, a petitioner "must have fairly presented [the] claim in the state courts." *Rose v. Palmateer*, 395 F.3d 1108, 1110 (9th Cir. 2005) (quoting *Baldwin v. Reese*, 541 U.S. 27 (2004)).

"To fairly present a federal claim, a state prisoner must present to the state courts both the operative facts and the federal legal theories that animate the claim." *Arrendondo v. Neven*, 763 F.3d 1122, 1138 (9th Cir. 2014) (citing *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996)). So, "a state prisoner has not 'fairly presented' (and thus exhausted) his federal claims in state court unless he specifically indicated to that court that those claims were based on federal law." *Lyons v. Crawford*, 232 F.3d 666, 668 (9th Cir. 2000) (citing *Shumway v. Payne*, 223 F.3d 982, 987-88 (9th Cir. 2000)), *amended and superseded on other grounds*, 247 F.3d 904 (9th Cir. 2001). So, "the petitioner must make the federal basis of the claim explicit either by citing federal law or the decisions of federal courts, even if the federal basis is 'self-evident,' . . . or the underlying claim would be decided under state law on the same considerations that would control resolution of the claim on federal grounds." *Id.* (citations omitted); *see also Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) ("[A] citation to a state case analyzing a federal constitutional issue serves

United States District Court
Northern District of California

the same purpose as a citation to a federal case analyzing such an issue.").

Respondents argue Petitioner has not exhausted this claim because he did not fairly present it as a federal due process claim before the California Court of Appeal. There, although Petitioner argued "[b]y presenting Lomeli as both a fact and expert witness, the prosecutor improperly vouched for Lomeli's credibility," Petitioner did not state such improper vouching violated his federal Due Process rights. (Dkt. No. 14-28 at 59.) However, Petitioner cited decisions of federal courts addressing his present federal constitutional claim and California cases analyzing the same federal constitutional issue. *See, e.g.*, *United States v. Edwards*, 154 F.3d 915, 921 (9th Cir. 1998); *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980); *People v. Donaldson*, 93 Cal. App. 4th 916, 929 (2001) (citing *Edwards*, 154 F.3d at 921). So, Petitioner fairly presented his due process claim to the California Court of Appeal.

### C. Analysis of Federal Claim

The state court's holding was not contrary to or an unreasonable application of clearly established Supreme Court precedent. The only Supreme Court case Petitioner cites is *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), which rejected a claim "a prosecutor's remark about [a] respondent's expectations at trial by itself so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 643. Because *Donnelly* considered a prosecutor's own remarks, rather than the remarks of a witness called by a prosecutor, *Donnelly* does not suffice to show Petitioner is entitled to habeas relief.

Furthermore, Ninth Circuit precedent reinforces the conclusion the state court's holding was not contrary to or an unreasonable application of federal law. For example, there is nothing necessarily wrong with a witness providing both lay and expert testimony. *See, e.g.*, *United States v. Vera*, 770 F.3d 1232, 1242 (9th Cir. 2014) ("A law enforcement officer testifying as an expert in drug jargon may also testify as a lay witness if he was involved in the investigation." (citation omitted)). Similarly, an expert can agree with or rely upon the opinions of another expert. *See, e.g.*, *MediaTek inc. v. Freescale Semiconductor, Inc.*, No. 11-CV-5341 YGR, 2014 WL 971765, at *1 (N.D. Cal. Mar. 5, 2014) ("[E]xperts can rely upon the opinions of other experts." (citations omitted)); *United States v. Pritchard*, 692 F. App'x 349, 351 (9th Cir. 2017) (allowing an expert to

apply her expertise to other scientists' conclusions); *cf. In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013) ("Where the 'soundness of the underlying expert judgment is in issue,' the testifying expert cannot merely act as a conduit for the underlying expert's opinion." (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002)).

In addition, merely calling a witness does not constitute improper vouching. "A prosecutor may not impart to the jury his belief that a government witness is credible," and "[w]hen the credibility of witnesses is crucial, improper vouching is particularly likely to jeopardize the fundamental fairness of the trial." *Edwards*, 154 F.3d at 921 (citations omitted). But "[i]mproper vouching typically occurs in two situations: (1) the prosecutor places the prestige of the government behind a witness by expressing his or her personal belief in the veracity of the witness, or (2) the prosecutor indicates that information not presented to the jury supports the witness's testimony." *United States v. Brooks*, 508 F.3d 1205, 1209 (9th Cir. 2007) (quotation marks and citations omitted). Petitioner does not identify any prosecutor statements either expressing his or her personal belief in, or indicating non-presented information supported, Mr. Lomeli's or Ms. Ramirez's testimony. Even assuming Petitioner had done so, Petitioner has not shown that testimony "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. at 643.

So, the state court's rejection of his claim was not contrary to, or involve an unreasonable application of, clearly established Supreme Court precedent.

## IV. FAILURE TO INSTRUCT THE JURY MR. LOMELI'S TESTIMONY, AS AN ACCOMPLICE'S, SHOULD BE VIEWED WITH CAUTION

At trial, Mr. Lomeli testified Petitioner asked him to help look for bullet shells in Petitioner's car, and he was a member of the VLT or Poco Way Sureño gang with Petitioner. (Dkt. No. 14-20 at 25-26, 51; Dkt. No. 14-19 at 54-55.) Petitioner therefore argues there was sufficient evidence Mr. Lomeli was an accomplice to warrant an instruction Mr. Lomeli's testimony should be viewed with caution, and the trial court's failure to do so worsened the due process problems already involved in his testimony.

United States District Court
Northern District of California

**A. State Court Opinion**

In rejecting Petitioner's argument, the California Court of Appeal wrote:

> Gonzalez asserts there was significant evidence Lomeli was an accomplice to the Heredia shooting, and therefore, the trial court erred by failing to sua sponte instruct the jury on accomplice testimony (CALCRIM No. 334). We disagree. We conclude the trial court did not error because the evidence was insufficient as a matter of law to support a finding Lomeli was an accomplice to Heredia's murder.
>
> **A. Applicable Law**
>
> A criminal conviction cannot stand "upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." (§ 1111.) Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." "'To be chargeable with an identical offense, a witness must be considered a principal under section 31.' [Citations.]" *(People v. Johnsen* (2021) 10 Cal.5th 1116, 1155 (*Johnsen*).) "That statute defines principals to include '[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . .' [Citations.]" (*People v. Horton* (1995) 11 Cal.4th 1068, 1113-1114 (*Horton*).) "An accomplice must have '"guilty knowledge and intent with regard to the commission of the crime."' [Citations.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 302 (*Gonzales and Soliz*).) "A mere accessory, however, is not liable to prosecution for the identical offense, and therefore is not an accomplice. [Citations.]" (*Horton*, *supra*, 11 Cal.4th at p. 1114.)
>
> "Only when there is 'substantial evidence that a witness who has implicated the defendant was an accomplice' must the trial court instruct on 'the principles regarding accomplice testimony.' [Citations.]" (*Johnsen*, *supra*, 10 Cal.5th at p. 1155.) "Substantial evidence is 'evidence sufficient to "deserve consideration by the jury," not "whenever any evidence is presented, no matter how weak."' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 369.) "'"[I]f the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony."' [Citation.]" (*Johnsen*, *supra*, 10 Cal.5th at p. 1155.)
>
> **B. Analysis**
>
> Gonzalez contends evidence Lomeli assisted him in searching for and, presumably, disposing of expended shell casings after the Heredia shooting was sufficient to require the court to sua sponte instruct the jury on accomplice testimony. Gonzalez is mistaken.
>
> Lomeli's conduct after Heredia's murder might have

> implicated him as an accessory, but his conduct would not subject him to accomplice liability for murder. A witness's "assistance in disposing of evidence of the various crimes makes him, at most, an accessory after the fact; a mere accessory is not an accomplice." (*People v. Balderas* (1985) 41 Cal.3d 144, 193; *accord Horton*, *supra*, 11 Cal.4th at pp. 1114-1116 [evidence of witness's conduct after commission of crimes, including retrieving criminal proceeds and driving defendant to bus stop, did not subject him to accomplice liability].) Nor did Lomeli's involvement in the same criminal street gang make him an accomplice to Heredia's murder, as Gonzalez contends it does. Because the evidence was insufficient as a matter of law to support a finding Lomeli was an accomplice, the court's failure to give CALCRIM No. 334 was not instructional error.

(Dkt. No. 14-31 at 22-23.)

**B. Analysis of Federal Claim**

To argue an accomplice jury instruction was necessary, Petitioner relies on California law holding "when there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices, including the need for corroboration." *People v. Tobias*, 25 Cal. 4th 327, 331 (2001) (cleaned up). However, a petitioner cannot allege a deprivation of federal rights warranting habeas relief by challenging jury instructions required only by state law. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982) ("Insofar as respondents simply challenge the correctness of the self-defense instructions under Ohio law, they allege no deprivation of federal rights and may not obtain habeas relief."); *see also Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) ("Any error in the state court's determination of whether state law allowed for an instruction in this case cannot form the basis for federal habeas relief." (citation omitted)).

Petitioner concedes the omission of the instruction "does not by itself violate Fourteenth Amendment due process," but argues "the failure to instruct here worsened the due process problems [otherwise] involved with" Mr. Lomeli's testimony. (Dkt. No. 1 at 38.) But the California Court of Appeal's determination accomplice instructions were not required under California Penal Code § 1111 law binds this Court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." (citations omitted)); *see also Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) ("A state court

has the last word on the interpretation of state law." (citation omitted)). And the Ninth Circuit has specifically held California Penal Code § 1111 is a state statutory rule "not required by the Constitution or federal law." *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) (citations omitted). So, "habeas will lie for [Petitioner] only if the alleged violation of section 1111 denied [Petitioner] his due process right to fundamental fairness." *Id.* (citation omitted). Petitioner does not argue this is the case.

So, because Petitioner's claim is based on a state law violation, the state court's refusal to provide an accomplice instruction was not contrary to, or involve an unreasonable application of, clearly established Supreme Court precedent.

## V. ADMITTING YAJAIRA GONZALEZ'S COERCED AND INVOLUNTARY STATEMENTS TO THE POLICE

According to Petitioner, when officers interviewed his sister, Ms. Gonzalez, they warned her "she could be prosecuted for aiding and abetting the commission of a homicide" if she attempted to give Petitioner a false alibi, and "if she claimed to be driving the black car seen near the Capitol Park shooting, it meant that she was in the car and directly involved in the shooting." (Dkt. No. 1 at 38-39.) An officer also told her "the penalty for homicide was death by electric chair," and if she did not implicate Petitioner in the Capitol Park shooting, "she would be arrested and jailed and [] her family would lose their home because she was the main source of support." (*Id.* at 39.) Petitioner therefore argues Ms. Gonzalez's statements were coerced and involuntary, and admission of those statements at Petitioner's trial deprived him of his Fourteenth Amendment due process right to a fair trial.

### A. State Court Opinion

When Petitioner raised this argument before the California Court of Appeal, the court reviewed Ms. Gonzalez's police interview and concluded her statements were voluntary, not coerced, and therefore properly admitted by the trial court, so the court did rejected Petitioner's constitutional argument.[4] Specifically, the Court of Appeal wrote:

> Gonzalez contends Sister's statements to the police were the

[4] The Court of Appeal named Ms. Gonzalez "Sister" throughout its opinion.

involuntary product of coercive police interrogation and their admission at trial violated his due process rights under the state and federal Constitutions. We disagree.

**A. Police Interview**

After Cortez was killed and Gonzalez was arrested, the police called Sister to come and retrieve her Altima. Detectives Guire and Tran interviewed Sister at the police station for about five hours.

At the beginning of the interview, Sister told the detectives the day Cortez was shot in Capitol Park, she was driving the Challenger while running errands with her mother. She said Gonzalez was home when she left around 2:00 p.m. and still home when she returned at 8:00 p.m. The detectives told Sister they could easily prove who was driving the car on the day of the shooting and warned her not to get herself in trouble to protect Gonzalez, her younger brother. They urged her to be completely honest with them. They asked who was driving the Challenger and warned Sister if she lied to help her brother, she would get herself in trouble. The detectives explained to Sister her brother had been arrested for a homicide at Capitol Park. They said they knew Gonzalez was driving the car, not her. When Sister again proclaimed she was driving the car the day of the shooting, Guire told her she had to decide whether she was going to "throw [herself] under the bus for her brother." He then stated, "At the end of the day, you're gonna walk out of here but realize that you're gonna own the statement here. Okay? Because I'm gonna come through with a wrecking ball at the other end because if you're bullshittin' me and you tell me lies to cover [for] him, I will run you over."

Sister maintained she was driving the Challenger the day of the shooting and was not lying to the detectives. Guire told her it was the same paperwork to put her in jail as to not. He tried talking to her and said he hoped something he said made her realize her brother was "not worth it." Guire told Sister to consider her brother had been arrested for homicide and "the penalty for homicide is" electrocution or "a lot of years in jail." He explained they had evidence Gonzalez was driving the car when Cortez was shot.

Guire endeavored to build Sister's trust and told her to be truthful. Sister's initial story began to shift. She said the Challenger was at the house the day of the shooting but she did not know if or when Gonzalez took it because she was not home until later and she took the Challenger to work around 7:00 p.m. As the interview continued, Guire warned Sister she was "placing [herself] in a very, very, very tight box" by being untruthful and continuing to say she drove the car. He stated, "aid and abetting a homicide is almost like committing the homicide yourself." Guire told Sister, "I'm not gonna put this on you. But I am going to press you because I don't want you to own something that [Gonzalez] needs to own." Guire asked Sister to consider what would happen to her family if she was taken away from them for two weeks or four months and whether they would be able to pay their rent and live in the same place. Guire explained Gonzalez was "done" but she did not have to go down with him. Guire inquired if Gonzalez asked her to cover for him. Sister denied

United States District Court
Northern District of California

Gonzalez told her anything. She said Gonzalez drove the Challenger some that day, but she did not know what time. When she went to leave around 7:00 p.m., she realized Gonzalez had taken the Altima and left her the Challenger.

Guire asked Sister why she initially lied to them about driving the car all day. Sister said she did because she was scared and wanted to protect her brother. She denied Gonzalez asked her to lie for him. Guire responded that if Gonzalez did not ask her to lie then she was the "mastermind" of the lie. When Sister asked, "what do you want me to tell you?" Guire responded, "I want you to tell me the truth. I want you to tell me the truth." Sister said she was scared because she had never been in trouble. Guire reiterated he knew she was not involved in the homicide. He said he had talked to Gonzalez and knew Gonzalez had a conversation with Sister. Guire urged Sister to think about her family, telling her, "You shoulder it all [for your family]. You carry it. You can't carry this one. This one's way too big. [pause] Tell me about the conversation. Tell me why you lied. [pause] You can't carry it." Sister admitted when Gonzalez got home the night of the shooting, he told her to drive the Challenger.

Sister denied knowing anything else. Guire said, "I'll be here all night." Sister responded, "But I have to go to work. [¶] . . . [¶] I have to go to sleep." She explained her parents were waiting outside and they were tired also. Guire reminded Sister she was free to leave at any time.

Sister stated she lied because she was scared and knew Gonzalez was in "big trouble." Guire encouraged Sister to tell the truth and reassured her that she would not get in trouble for doing so. He told her, "You're not gonna get in trouble if you're truthful." After several long pauses, Sister said she did not want to go to jail and complained her head hurt already. She stated Gonzalez told her "his friends got in trouble" but he did not tell her why. She assumed Gonzalez was with them and she lied about driving the car because she wanted to protect him. She conceded she could not say she was driving the car when she was not.

Sister was left alone in the interview room for about six minutes while the detectives took a bathroom break. When Guire returned, he told Sister that he believed she knew more about Gonzalez's involvement. Sister said she had already disclosed what she knew. When Guire asked Sister to reexplain it for his partner, Sister said she wanted to leave. Guire reminded Sister she was free to leave any time she wanted. Sister said she wanted to go because she was tired and had already told them what she knew. Tran stood up and said, "Okay come on we'll get you out of here." Sister walked to the door. Guire asked Sister if she wanted some water to go. She declined the water but said she needed to use the restroom.

About five minutes later, Sister returned to the interview room with Tran. He then left Sister alone in the interview room. During this time, Sister spoke to her father by telephone, telling him the police were interrogating her and if she did not answer their questions, they would arrest her the next day. When Tran returned, he asked her if she understood how important it was for her "to be a hundred percent

truthful and honest" with them. He reminded her that she was not under arrest and was free to leave any time she wanted. He then requested she tell him everything "this one last time."

Sister went through the events of the day Cortez was killed, saying she got home around 6:00 p.m. Gonzalez came home in the Challenger within an hour. When she went to leave about 7:00 p.m., she discovered Gonzalez had taken the Altima without telling her. She called him and he told her to drive the Challenger. He later told her that he was scared because one of his friends had messed up by shooting someone.

Tran told Sister that she needed to take care of herself and expressed his belief she had not been completely truthful with him. He continued, "I don't have any more time to sit here and just wait for when you decide when. I thought you made that decision already. Apparently you haven't. 'Kay I'm not gonna force you. Okay?" Sister stated she wanted to help but did not want to get in trouble. Tran responded, "You're not . . . helping. I don't need your help. . . . I'm giving you . . . an opportunity to help yourself. Okay it's not about helping me, it's not about helping my partner or helping your brother. It's about you helping yourself. You need to realize that. Okay? It's not about helping anybody here but you. And I don't wanna stay any longer than I . . . have to." Sister asked what else he wanted to know. After looking at Sister's text messages with Gonzalez, Tran told her it was easy for him to prove her lies. He said, "You got about five more minutes with me and that is it. I have no more patience for you."

Sister told Tran he made her nervous. Tran responded, "Don't give me this bullshit, I'm scared, I'm nervous. You either talk to me right now or I'm out of here. I don't have time for this. Do you understand?" After Sister responded affirmatively, Tran continued, "Okay. Let me know when you're ready to talk if not, let's get out of here. Let's not waste time I'm done." Sister said she did not want to waste time. Tran told her that he did not have time to play games and she either needed to tell him the truth or not talk to him. He said he would have Guire come back in and Sister could talk to him and tell him "everything."

Tran left the room briefly and returned with Guire. Tran asked Sister, "Okay are we gonna do this?" and she responded, "I want to do this." He told her to start when she was ready and to give them "a hundred percent truth." Sister said the day Cortez was killed, that night she heard Gonzalez talking to his friends on his phone and he asked one of them about spending the night at their house. Gonzalez told Sister he was scared and did not want to stay home because they were going to come looking for him. He said he did not do anything but his friend "fucked up" and shot a person. He told her to drive the Challenger and "clean it."

Guire asked what Gonzalez meant by cleaning the car and Sister said she thought he meant wash it so she took it to a car wash. Guire did not believe her. Guire said Gonzalez wanted her to drive the car and get stopped in it so people would believe she was driving and he was not. He told her, "This is how serious we are, you have information about a homicide and actively assist him in covering it

up." He asked her if she wanted him to bring in some handcuffs so she could feel them "because they are scary."

Tran said he knew Gonzalez came home and told her that he shot somebody but Sister was afraid to tell them because she did not want to get in trouble or get her brother in trouble. Practically yelling at Sister, Tran asked if she wanted to "go inside" with Gonzalez. When Sister said she did not, Tran told her to tell them the truth, "Please." Sister sighed and said Gonzalez told her that he was in the car when his friends shot a person. Tran accused Sister of lying when she said Gonzalez told her that his friends shot someone. Guire told Sister she was "so hosed." He continued, "You're in a lot of trouble. I'm not screwing around either. It's not like the last time. . . ." Sister asked if everything she said would be on her brother. Guire responded better Gonzalez than her and urged her to "spit it out." She asked if she told them what she knew was she going to "be out of this problem." Tran responded she needed to think for herself and the rest of her family. Sister said the day after Cortez was killed, Gonzalez told her three guys tried to shoot him so he took out a gun and shot at them.

**B. Proceedings in Trial Court**

Prior to trial, the defense moved in limine to suppress Sister's statements to the police implicating Gonzalez in Cortez's murder. The defense asserted Sister's statements were inherently unreliable as they resulted from police coercion. After reviewing the recording of Sister's police interview, the trial court denied the motion, finding there was no coercion and her statements were voluntary.

At trial, Sister testified she did not recall anything she said during her police interview. Over defense objection, the court permitted the prosecution to play the video recording of Sister's police interview in its entirety as a prior inconsistent statement. (Evid. Code, § 1235.)

**C. Applicable Law**

When seeking to exclude a witness's pretrial statements obtained through unlawful police coercion, the defendant must prove the unlawful coercion. (*People v. Lee* (2002) 95 Cal.App.4th 772, 788 (*Lee*).) If successful, the evidence is excluded as "'inherently unreliable'" (*ibid.*) "to assure the reliability of the trial proceedings. . . .'" (*Id.* at p. 782, fn. omitted.) A witness's statement is coerced if it is the product of police conduct that overcomes the person's free will. (*Ibid.*)

The rules that apply when the police obtain a confession from an accused, also apply when they obtain a statement from a witness. (*Lee, supra*, 95 Cal.App.4th at p. 785.) In determining whether a statement was voluntarily made, we consider "the totality of all the surrounding circumstances," including the person's characteristics and "details of the interrogation." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226; *People v. Neal* (2003) 31 Cal.4th 63, 79.) Factors relevant to this determination include the person's "youth, inexperience, minimal education, . . . low intelligence[,]" deprivation

United States District Court
Northern District of California

of food or drink, deliberate violation of the dictates of *Miranda v. Arizona* (1966) 384 U.S. 436, and repeatedly accusing the person of lying. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1078 (*Nguyen*).)

"'A statement is involuntary [citation] when, among other circumstances, it "was '"extracted by any sort of threats . . . , [or] obtained by any direct or implied promises, however slight . . . ."' [Citations.]" (*Nguyen, supra*, 61 Cal.4th at p. 1078.) "'However, mere advice or exhortation by the police that it would be better for the [witness] to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent [statement] involuntary. . . . Thus, "[w]hen the benefit pointed out by the police to a [witness] is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.]'" (*People v. Holloway* (2004) 33 Cal.4th 96, 115.)

Where, as here, the facts concerning the alleged coercion are undisputed, we review the record de novo to determine whether Sister's statement was voluntary under the totality of the circumstances. (*Lee, supra*, 95 Cal.App.4th at p. 781.)

**D. Analysis**

Having reviewed Sister's police interview and looking at the totality of the circumstances, we conclude her statements were voluntary and not induced by police misconduct. Initially, we note the absence of a key fact—Sister never testified her statements were coerced. At trial, she claimed she did not recall what she told the police. She also testified she had no reason to lie to the police during her interview. This weighs heavily in favor of finding Sister's statements were not coerced.

Gonzalez contends Sister's statements to the police were coerced because: (1) Guire warned her that she could be prosecuted for aiding and abetting the commission of a homicide based on her attempt to create a false alibi for Gonzalez; (2) Guire told her the penalty for homicide was death by electrocution or a lot of years; and (3) Guire threatened to arrest her if she did not give a statement implicating him as Cortez's murderer. Gonzalez's characterization of the interview is not supported by the record. The detectives did not threaten to arrest Sister if she failed to give a statement implicating her brother as Cortez's murderer. They urged her to tell the truth and cautioned her that she could get in trouble if she did not, but they did not threaten to arrest her. In fact, they told her at least twice during the interview she was not under arrest and was free to leave anytime she wanted.

Guire did tell Sister the penalty for homicide was death by electrocution or a lot of years in jail, but he did not *threaten* her with the death penalty. Guire's reference to the death penalty came after he told Sister that Gonzalez had been arrested for Cortez's homicide and they had evidence he was driving the car when Cortez was shot. Moreover, a "mere '[r]eference to the death penalty does not necessarily render a statement involuntary.' [Citation.]" (*People v. Winbush* (2017) 2 Cal.5th 402, 453 (*Winbush*).) Although Guire told

> Sister that aiding and abetting a homicide was "almost like committing the homicide," he immediately followed that statement by telling her, "I'm not gonna put this on you." At different points in the interview, Guire told Sister he knew she was not involved in the homicide.
>
> The detectives did not promise Sister anything if she implicated her brother. After Sister claimed she was driving the car, not Gonzalez, the day Cortez was killed, the detectives urged her to tell the truth. Once she admitted to lying about driving the car, they pressed her hard to find out why she tried to create a false alibi for her brother.
>
> The circumstances surrounding Sister's police interview do not compel us to conclude her statements were coerced by the detectives. Sister went to the police station with her parents for the purpose of retrieving her car. Sister indicated she understood she was not under arrest. The interview lasted about five hours. While long, the length of the interview was not excessive given the nature of the case. (See *Winbush, supra*, 2 Cal.5th at p. 454 [six-hour interrogation not coercive].) The detectives twice paused the interview so Sister could talk on the telephone to her father, who was waiting outside. They also paused the questioning for bathroom breaks and offered Sister water more than once. It is true Sister had no prior experience with the criminal justice system. But the record does not show she was vulnerable to police coercion. (See *People v. Boyette* (2002) 29 Cal.4th 381, 411 [maturity is a factor considered in determining voluntariness of statement].) Sister was responsible and hardworking. She worked two jobs to help her family financially. And there was no evidence she had low intelligence. While the detectives impressed upon Sister how serious the situation was and repeatedly and sometimes loudly pressed her to tell the truth, their questioning was not coercive.
>
> Gonzalez misplaces his reliance on *People v. McClary* (1977) 20 Cal.3d 218 (*McClary*), overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 510, fn. 17, as *McClary* is factually distinguishable. In *McClary*, officers ignored repeated requests for counsel from the 16-year-old suspect, falsely told her she would face the death penalty unless she changed her statement, and implied she would only be charged as an accessory is she admitted "'knowledge'" of the murder. (*Id.* at p. 229.) Here, Sister was neither a minor nor did she request the assistance of counsel at any time during the interview. The detectives never threatened her with the death penalty. Nor did the police promise a particular charge or other lenient treatment in exchange for her cooperation.
>
> In summary, we conclude the detectives did not cross the line from proper exhortations to tell the truth into impermissible threats of punishment or promises of leniency when interviewing Sister. Accordingly, the court properly admitted Sister's police interview.

(Dkt. No. 14-31 at 23-32.)

**B. Analysis of Federal Claim**

The Supreme Court has held a defendant's own involuntary or coerced confession cannot be used at the defendant's trial. *See Jackson v. Denno*, 378 U.S. 368, 385-86 (1964). But "[t]he Supreme Court has not decided whether the admission of a coerced third-party statement is unconstitutional." *Samuel v. Frank*, 525 F.3d 566, 569 (7th Cir. 2008); *see also Turner v. Katavich*, No. 14-CV-3428-TEH, 2015 WL 6689390, at *9 (N.D. Cal. Nov. 3, 2015) ("[T]he Supreme Court has not . . . held that a criminal defendant is entitled to habeas relief if the admission of a coerced third party testimony rendered his trial so fundamentally unfair as to violate due process." (citation omitted)); *Trammell v. Ducart*, No. 1:14-CV-00954-AWI, 2015 WL 4496338, at *10 (E.D. Cal. July 23, 2015) ("No Supreme Court case addresses the issue of whether coerced witness testimony can be used against a defendant at trial."); *Meraz v. Pfeiffer*, No. 18-55862, 2023 WL 177629, at *3 (9th Cir. Jan. 13, 2023) ("[T]he Supreme Court has never held that admission of coerced, non-testimonial statements by an unavailable third-party declarant violates a defendant's federal due process rights."). And in the absence of Supreme Court precedent establishing the constitutional right underlying Petitioner's claim, the state court's denial of that claim cannot prove contrary to, or involve an unreasonable application of, clearly established federal law. *See Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." (cleaned up)). So, even if the state court's determination Ms. Gonzalez's statement was not coerced involved an unreasonable application of clearly established federal law, its rejection of Petitioner's constitutional claim based on introduction of that statement is not contrary to clearly established federal law.

And although the Ninth Circuit in *Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004), suggested a defendant "is entitled to habeas relief if the trial court's admission of [a third party's coerced] testimony rendered the trial so fundamentally unfair as to violate due process," the Ninth Circuit also made clear the petitioner had "filed his habeas corpus petition before the AEDPA's effective date, [so] pre-AEDPA law applie[d] to the merits of his petition." *Id.* at 586, 593

(citations omitted). So, because AEDPA applies to Petitioner's habeas corpus petition, *Williams* does not support an argument Petitioner's constitutional claim suffices for habeas relief. *See, e.g.*, *Turner*, 2015 WL 6689390, at *9 (refusing to apply *Williams* "[i]n the absence of clearly established Supreme Court authority"); *Arias v. Warden, Centinela State Prison*, No. CV 18-5714-AG(E), 2019 WL 1075275, at *7 (C.D. Cal. Jan. 25, 2019) (refusing to rely on *Williams* because "circuit precedent does not constitute clearly established Federal law as determined by the Supreme Court within the meaning of section 2254(d)" (cleaned up)), *report and recommendation adopted*, 2019 WL 1438066 (C.D. Cal. Mar. 30, 2019).

Furthermore, the Supreme Court cases Petitioner cites do not clearly establish the admission of a coerced third-party statement violates a defendant's Due Process rights. Petitioner cites several cases involving introduction of a defendant's own coerced or involuntary statements, rather than a third-party's allegedly coerced statements. *See, e.g.*, *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963); *Blackburn v. State of Ala.*, 361 U.S. 199, 210 (1960); *Haynes v. State of Wash.*, 373 U.S. 503, 514 (1963); *Hutto v. Ross*, 429 U.S. 28, 30 (1976); *see also Lego v. Twomey*, 404 U.S. 477, 478 (1972) (addressing the standard of proof for voluntariness at a coercion hearing); *Rogers v. Richmond*, 365 U.S. 534, 543-44 (1961) (holding a court's determination of whether a defendant's confessions were voluntary and non-coerced cannot consider their falsity). And Petitioner cites other cases addressing different constitutional rights. *See, e.g.*, *Malloy v. Hogan*, 378 U.S. 1, 8 (1964) (holding the Fourteenth Amendment incorporates the Fifth Amendment's right to remain silent); *Missouri v. Seibert*, 542 U.S. 600, 604 (2004) (holding inadmissible a statement made before *Miranda* warnings and then re-solicited after *Miranda* warnings); *California v. Beheler*, 463 U.S. 1121, 1121 (1983) (holding *Miranda* warnings are not required when a suspect voluntarily comes to the police station). So, Petitioner's reliance on these Supreme Court cases is not persuasive.

Because Petitioner's constitutional claim his Fourteenth Amendment due process right to a fair trial was violated through introduction of Ms. Gonzalez's allegedly coerced statements is not based on any clearly established Supreme Court law, the state court's rejection of his claim was not contrary to, or involve an unreasonable application of, clearly established Supreme Court

precedent.

## VI. THE CUMULATIVE EFFECT OF TRIAL ERRORS

Petitioner ultimately contends the cumulative effect of the trial court's alleged errors violated his Fourteenth Amendment Due Process right to a fair trial.

### A. State Court Opinion

In rejecting Petitioner's argument, the California Court of Appeal wrote:

> Gonzalez contends his due process right to a fair trial was violated because of the cumulative effect of the trial court's alleged errors. We disagree.
>
> A claim of cumulative error is essentially a due process claim, and the test is whether the defendant received a fair trial. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) However, where an appellate court has found no error in rejecting each of a defendant's claims, no cumulative error can be found. (*Ibid*.) Here, Gonzalez's cumulative error claim is without merit because we have rejected all his individual claims. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].)

(Dkt. No. 14-31 at 32-33.)

### B. Analysis of Federal Claim

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298, 302-03 (1973)). However, "no cumulative prejudice is possible" when "no error of constitutional magnitude occurred." *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (citation omitted). "There [also] can be no cumulative error when a defendant fails to identify more than one error." *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012) (citation omitted).

Here, the Court has not found any constitutional error occurred, much less more than one error. So, the state court's rejection of Petitioner's argument the cumulative effect of trial errors violated his Fourteenth Amendment Due Process right to a fair trial was not contrary to, or involve an unreasonable application of, clearly established Supreme Court precedent.

**CONCLUSION**

For the reasons stated above, the state court's adjudication of Petitioner's claims did not result in a decision which "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or which "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d). The Court therefore DENIES the petition for a writ of habeas corpus.

The Court will issue a certificate of appealability only for the first issue—whether a mistrial should have been declared due to the prosecution's elicitation of testimony regarding another shooting. *See* 28 U.S.C. § 2253(c). None of the other issues warrant a certificate because Petitioner has not shown reasonable jurists would find "the district court's assessment of the constitutional claims debatable or wrong," or "find it debatable whether the petition states a valid claim of the denial of a constitutional right and . . . the district court was correct in its procedural ruling." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court will enter judgment.

**IT IS SO ORDERED.**

Dated: August 14, 2026

JACQUELINE SCOTT CORLEY
United States District Judge